UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert B. FRENCH (90–6222); Jay C. Emerson (90–6407); James W. Caldwell (90–6408); Kenneth L. Foster (90–6477), Defendants–Appellants.

Nos. 90–6222, 90–6407, 90–6408 and 90–6477.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 20, 1992.

Decided Aug. 20, 1992.

Rehearing and Rehearing En Banc Denied Sept. 25, 1992.

Ed Bryant, U.S. Atty., Timothy R. DiScenza, Asst. U.S. Atty. (argued and briefed), Memphis, Tenn., for U.S.

Nancy Hollander, Freedman, Boyd & Daniels, Albuquerque, N.M. (argued and briefed), for Robert Bernal French.

David W. Coody, Law Office of David W. Coody, Dallas, Tex. (argued and briefed), for Jay Caldwell Emerson.

J. Stephen Cooper, Cooper & Rogers, Dallas, Tex. (argued and briefed), for James William Caldwell.

John R. Smith, Center, Tex. (argued and briefed), for Kenneth Lee Foster.

Before: KEITH and SILER, Circuit Judges; and WELLFORD, Senior Circuit Judge.

## AMENDED OPINION

WELLFORD, Senior Circuit Judge.

Detective R.G. Coleman, an off-duty Memphis Police officer, observed a Ryder Rental truck with Indiana license plates and a white Mercedes–Benz automobile with Texas license plates entering Interstate I–40 approaching an interchange at Canada Road near Memphis. Coleman became suspicious that the cars were riding "in tandem" and, therefore, followed the vehicles on the interstate. As he followed, Coleman noticed that a Chrysler automobile, also with a Texas license plate, appeared to be riding in "convoy" with the other two vehicles. While Coleman observed them, he called his office at the

Memphis Police Department for back-up assistance. He saw all three of the vehicles pull off of the interstate highway at the Canada Road exit, and noticed the occupants of all the vehicles talking together. He was joined by Lt. Larry Clemmer, also a Memphis police officer. In the meantime, one of Coleman's supervisors notified the Tennessee Highway Patrol about Coleman's suspicions. The supervisor made no mention of speeding or improper operation of any of the three vehicles being observed.

As the three vehicles prepared to head back onto the interstate, heading eastwardly from Memphis, Clemmer took a position ahead of them, and Coleman took his position in back. Clemmer soon thereafter clocked both the Mercedes–Benz and the truck going 72 m.p.h. in a 65 m.p.h. zone. Clemmer notified the Tennessee Highway Patrol dispatcher that three vehicles were being followed by officers of the Memphis Police Department, and that the two of them were speeding. Officers of the Highway Patrol eventually reached the vehicles, and the Mercedes (driven by defendant Robert Bernal French and occupied by defendant Kenneth Lee Foster) was stopped by patrolman Ross. Coleman and Ross prepared a speeding ticket that was eventually issued to the Mercedes, although Ross did not personally witness the speeding.

At about this same time, patrolman Cathy of the Highway Patrol stopped the truck (driven by defendant Jay Caldwell Emerson) because he noticed its erratic operation. When defendant Emerson got out of the truck, he was observed to be intoxicated, and Cathy arrested Emerson for driving while intoxicated. It was only later that Cathy learned that this truck was involved in the speeding incident reported by Coleman.

Shortly after the stop of the truck, officer Clemmer noticed a strong scent of marijuana emanating from it. Other officers also detected the suspected marijuana smell. Clemmer called for a drug sniffing dog which was 50 miles away in Memphis. It took some time for the dog to arrive. The dog indicated the presence of drugs,

and a search warrant was promptly obtained for the truck. The officers found about 4,457.5 pounds of marijuana in the truck, along with a lease agreement in the passenger compartment.

After Ross stopped the Mercedes, but before he issued the speeding ticket, he moved the Mercedes off of the road closer to the truck for claimed safety reasons since it was raining. There was apparently no objection to the officer moving the Mercedes. Ross then issued defendant French a speeding ticket based on the observations and charge of Coleman. Eventually, the Chrysler (driven by defendant James William Caldwell) was also stopped. After the officers at the scene had smelled marijuana in the truck, defendant French, the owner of the Mercedes, gave the officers his written consent to search this car. Before he signed the consent form, French had been detained for some time, and the officers informed him that they were conducting a drug investigation. Marijuana and other incriminating evidence were found in the search of the Mercedes and French was thereafter arrested. Other material evidence was found in the Chrysler as a result of a search, which evidence was suppressed by the trial court.

On January 17, 1989, shortly after the episode described, all four of the defendants were indicted for: (1) possession with intent to distribute approximately 4,457 pounds of marijuana, and (2) conspiracy to commit that crime. A magistrate judge held an evidentiary hearing on referral from the district court on the defendants' motions to suppress the aforementioned evidence, and recommended overruling those motions. The district court heard oral arguments on the exceptions to the magistrate judge's proposed findings, and generally approved the proposed order overruling the motions to suppress with some modifications.

Defendants French and Emerson changed their plea to "guilty" on both counts. French, however, reserved the right to challenge the denial of his motion to suppress on appeal. French was sentenced to 120 months imprisonment to be

followed by a five year term of supervised release and a fine of $25,000. Emerson was sentenced to 292 months imprisonment to be followed by ten years supervised release and a fine of $25,000.

After trial, the defendants Caldwell and Foster were found guilty on both counts. Caldwell was sentenced to life imprisonment under 21 U.S.C. § 841(b)(1)(A). Foster was sentenced to a term of 121 months imprisonment to be followed by five years of supervised release and a $25,000 fine. All of the defendants have appealed different aspects of this case.

## I. SUPPRESSION

■ We must accept the findings of fact upon which the district court relied in dealing with suppression of evidence unless those findings are *clearly erroneous.* *United States v. Duncan,* 918 F.2d 647, 650 (6th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991); *United States v. Sangineto-Miranda,* 859 F.2d 1501, 1512 (6th Cir.1988); *United States v. Pino,* 855 F.2d 357, 361 (6th Cir.1988), *cert. denied,* 493 U.S. 1090, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990). Defendants French[1] and Foster now appeal the district court's order denying suppression of the marijuana found in the truck and the evidence found in the Mercedes–Benz.[2]

### A. *Standing*

The first question is whether either of these defendants, neither of which were drivers or passengers in the truck, have standing to challenge the searches. French and Foster claim to have standing to object to both the searches of the truck and the Mercedes, because they were illegally stopped and detained. They argue that the vehicles were stopped without probable cause to believe that any illegal

acts were taking place, and that the stops were made as a pretext to investigating a mere "hunch" about drug activity. We find no merit in this contention with regard to the stop of the truck; we consider this argument seriously with regard to the stop of the Mercedes.[3] The officers must have had a reasonable "objective assessment of [their] actions in light of the facts and circumstances confronting [them] at the time." *Maryland v. Macon,* 472 U.S. 463, 470, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1978) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)).

■ The truck was stopped, not because of any reports from Coleman or Clemmer, but because Sgt. Cathy witnessed the truck weaving on the road. He clearly had a legitimate basis on which to stop the truck. When Cathy stopped the truck, Emerson's intoxicated condition confirmed Cathy's suspicions about the driver. Also, Cathy's observations were corroborated by Clemmer's similar earlier statements regarding the vehicle's weaving. This stop was objectively reasonable. *See Pino,* 855 F.2d at 361 (district court's finding that weaving of a vehicle gave the officer probable cause to make a stop was not clearly erroneous).

■ Similarly, because the Mercedes was speeding, it could have been objectively reasonable for an officer to stop the vehicle to issue a ticket to the operator. *See United States v. Crotinger,* 928 F.2d 203 (6th Cir.1991); *United States v. Dunson,* 940 F.2d 989 (6th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992). In *Crotinger* and *Dunson,* we found that a legitimate stop for a speeding violation was not pretextual so that the officers could also search for drugs. The officers in this case, however, admitted that the stop of the Mercedes was

---

1. As stated above, French pleaded guilty, but he reserved the right to challenge the denial of his motion for suppression.

2. Neither Caldwell nor Emerson have addressed those issues in their briefs; we assume that they do not challenge that evidence.

3. French and Foster were occupants of the Mercedes. They were detained, however, because of the investigation relating to the contents of the truck. Because these defendants argue that they were illegally detained as a result of both of these stops, we will address the propriety of each stop in turn.

partially motivated by suspicions of drug activities.

The district court found that although the surveillance of the defendants may have been motivated by suspicions of drug transportation, the stop was valid because the defendants were speeding. Foster maintains that at the time the Mercedes was stopped "there was no reasonable suspicion that the Mercedes–Benz contained contraband or other evidence." We believe this assertion to be a true statement of affairs. We find, however, that the officers had a reasonable belief, considering in totality the observations made by individual officers, that the Mercedes was travelling in linkage with the truck and that the occupants were somehow acquainted or associated together.[4] We also find that the officers acted in an objectively reasonable manner because the Mercedes was, in fact, speeding. We conclude that the district court was not clearly in error in finding that the stops, though, perhaps at least, partially motivated by drug suspicions, were nevertheless legitimate, particularly with regard to the truck.

■ Since the stops of both the truck and the Mercedes were legitimate, we conclude also that the subsequent detention of the defendants was not unreasonable under the circumstances. The law enforcement officers needed reasonable suspicion or a "particularized and objective basis for suspecting a particular person of criminal activity." *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In addition, "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). *See also Delaware v. Prouse*, 440 U.S. 648, 653–655, 99 S.Ct. 1391, 1395–1397, 59 L.Ed.2d 660 (1979) ("stopping an automobile and detaining its occupants constitute a 'seizure'" absent "an objective standard" or "quantum of individualized suspicion" or "probable cause" to stop).

Almost immediately after the truck was stopped, the officers smelled an odor of marijuana emanating from the rear of the truck. Officers Coleman and Clemmer had observed that all three of the vehicles were riding "in tandem." The officers at the scene detained defendants no longer than it was necessary for the officers to follow up on their suspicions and confirm the fact that marijuana was in the truck.

As stated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the "objective standard" test to be applied in connection with the detention was whether "the facts available to the officer at the moment of the seizure or the search [would] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880. We believe the intrusion here, given the specific facts known, including a strong odor of marijuana and an apparent "tandem" or convoy arrangement of vehicles, was sufficient to satisfy the objective standard. The delay or time lag in the detention for further investigation did not render the decision of the district court erroneous. There was a "legitimate investigative function" served in the detention in this case. *Id.* at 22, 88 S.Ct. at 1880. Contrary to the position argued by French (Brief at p. 31), "evidence derived from the traffic stop" of the Mercedes, *coupled with that of the truck*, "justified the prolonged detention."

In sum, we believe there was established a "particularized basis" for believing that all of the defendants were involved with the marijuana, and that the defendants' detention was justified even though it took sometime to pursue the investigation. Consequently, we find that neither French nor Foster can establish standing to challenge either of the searches based on an "illegal stop and detention" theory.

With respect to the truck, the defendants Foster and French argue that they have expectations of privacy under the "convoy"

---

4. We reject Foster's "subjective test" argument. *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988), cited by Foster, involved an alleged seat belt violation, not a stop for speeding. *See*

*United States v. Pino*, 855 F.2d 357, 361 (6th Cir.1988), *cert. denied*, 493 U.S. 1090, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990); *United States v. Saperstein*, 723 F.2d 1221 (6th Cir.1983).

theory of standing. The government argues that these defendants do not have standing to challenge the search of the truck based on that theory.

■ Although neither French nor Foster owned or occupied the truck, they argue that "[a] person may have a legitimate expectation of privacy in a place or object he does not own." *United States v. Perez,* 689 F.2d 1336, 1338 (9th Cir.1982). The Supreme Court has stated that "[s]ubsequent attempts to vicariously assert violations of the Fourth Amendment rights of others have been repeatedly rejected by this Court." *United States v. Salvucci,* 448 U.S. 83, 86, 100 S.Ct. 2547, 2550, 65 L.Ed.2d 619 (1980); *see also, Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The defendants urge this court to view the convoy as a single unit and allow them to challenge the search of a vehicle in that unit, citing in support several cases from other circuits.[5] We decline to follow this rationale. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and *Salvucci, supra.* We find that only Emerson established any right of privacy in the contents of the truck, and that defendant has not challenged the search.

With respect to the Mercedes, French clearly has standing to challenge the search as owner and operator, and we will address his argument. Foster, however, argues that he has standing as a passenger to challenge the search of the Mercedes. Foster claims that he had a legitimate expectation of privacy, citing *United States v. Erwin,* 875 F.2d 268 (10th Cir.1989),[6] in support of this contention. Because we find that French's consent to search is effective as to Foster, we will assume, without deciding, that Foster has standing to challenge the search of the Mercedes.

**5.** *See United States v. Taketa,* 923 F.2d 665 (9th Cir.1991); *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989); *United States v. Pollock,* 726 F.2d 1456 (9th Cir.1984); *United States v. Johns,* 707 F.2d 1093 (9th Cir.1983), *rev'd on other grounds,* 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985).

**6.** *Erwin* holds that a passenger has standing to challenge a traffic stop of an automobile, but

**B.** *The Search of the Mercedes*

■ As stated above, French, the owner and driver of the Mercedes, gave a written consent to search the car. Assuming that Foster had an expectation of privacy in the car, the issue becomes whether French's consent is effective as to Foster. Under the "common authority" theory enunciated in *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), and expounded by this court in *United States v. Dunson,* 940 F.2d 989, 995 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992), we answer this question in the affirmative. If French's consent were voluntarily given, it would have been effective as to both French and Foster, his passenger. *See United States v. Pino,* 855 F.2d 357 (6th Cir.1988).

We must accept a finding of voluntary consent unless that finding was *clearly erroneous. Dunson,* 940 F.2d at 994. The government has the burden of demonstrating a valid consent to search. *Schnechloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Williams,* 754 F.2d 672 (6th Cir.1985). French admittedly signed a consent form to search the Mercedes he was driving. He was not a stranger to his rights in this encounter with law enforcement officers, and was apparently a literate, intelligent adult. The period of time involved between the stop of the Mercedes and the giving and signing of the consent to search was approximately forty-five minutes.[7] "[T]he voluntariness of [French's] consent is to be judged on the totality of the circumstances." *Florida v. Royer,* 460 U.S. 491, 516, 103 S.Ct. 1319, 1334, 75 L.Ed.2d 229 (1983) (Blackmun, J., dissenting).

■ The more important question is whether the delay entailed in the investiga-

not to an ensuing search of the vehicle after the driver and owner had given consent and concealed marijuana was found. We discuss the validity of the stop separately in the instant case.

**7.** Officer Cathy estimated "maybe" twenty to twenty-five minutes, but the longer time seems more accurate.

tion after the stop amounted to coercion or duress, or whether consent was freely or voluntarily given "in a spirit of apparent cooperation." *Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968) (quoted in *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980), and in *Royer*, 460 U.S. at 516, 103 S.Ct. at 1334). We have already held that the extended detention, under the totality of circumstances, was not unreasonable. *See Michigan v. Summers*, 452 U.S. 692, 702, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981); *Wong Sun v. United States*, 371 U.S. 471, 484–486, 83 S.Ct. 407, 415–417, 9 L.Ed.2d 441 (1963); *see also United States v. Knox*, 839 F.2d 285, 294 (6th Cir.1988). We, accordingly, find no error in the conclusion that the consent to search the Mercedes was valid.[8] Because no persuasive argument has been raised that the written consent form signed by French was involuntary, the district court was not clearly erroneous in overruling this contention of both French and Foster. In sum, French's written consent was effective as to both French and Foster, and neither prevails on his challenge as to the search of the Mercedes.

## II. TESTIMONY OF JOHN BASS

Foster next challenges the admission of certain testimonial evidence. He moved the district court for an evidentiary hearing to determine the admissibility of evidence of prior specific acts committed by him. The district court, in response to his motion, entered an order requiring the government to refrain from attempting to introduce evidence of "specific acts of misconduct, uncharged criminal conduct, extraneous offenses, or unalleged overt acts committed by [Foster] until this court has ruled upon their admissibility."

One week before trial, the government informed defense counsel that it had an informant (John Bass) to testify against Foster as to similar acts. Bass was allowed to testify at trial, over Foster's objection, that he, Bass, was a convicted felon, and that he was "busted" by a federal task force in June, 1989, because the authorities believed him to be a part of the charged conspiracy.[9] Bass' testimony was damaging to Foster because it alluded to a prior drug transaction involving Foster. This court will reverse, based upon erroneous admission of this type of evidence, only if the district court abused its discretion. *United States v. Hamilton*, 684 F.2d 380, 384 (6th Cir.1982), *cert. denied*, 459 U.S. 976, 103 S.Ct. 312, 74 L.Ed.2d 291 (1982). Although it is a close question, we find no abuse of discretion here.

■■■ In order for Rule 404(b) evidence to be admissible, the prior acts must have been substantially similar to the offense charged, and the court must issue a limiting instruction cautioning the jury not to consider such evidence for improper purposes.[10] *United States v. Ring*, 513 F.2d 1001, 1004 (6th Cir.1975). If the evidence is admitted for one of the purposes enumerated in the rule, then the court must also consider whether the probative value is outweighed by the prejudicial effect under Fed.R.Evid. 403. *United States v.*

---

**8.** We make no finding that, apart from the language of the consent form itself, the officers specifically advised French of his *Miranda* rights, although the magistrate judge found sufficient facts to indicate that he had. French makes no argument about coercion as such; rather, he maintains that the detention was illegal and therefore tainted the consent. He argues that "they had no reasonable suspicion that the Mercedes contained contraband;" he makes no such argument about no reasonable suspicion that the truck, with which the Mercedes was travelling, contained contraband. French argues that "if the court accepts the lower court's finding that the three vehicles were part of a convoy, the court must then treat

the convoy as a *single unit*." French's Brief at 15 (emphasis added).

**9.** Bass' testimony was based in part from "debriefing" information he obtained from the government on the charged conspiracy.

**10.** Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Acosta–Cazares,* 878 F.2d 945, 948–949 (6th Cir.), *cert. denied,* 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989). The government may use evidence of similar acts that are probative of intent if specific intent is an element of the crime charged, such as the conspiracy in this case. *See United States v. Pollard,* 778 F.2d 1177, 1179–1180 (6th Cir.1985); *United States v. Reed,* 647 F.2d 678, 686 (6th Cir.), *cert. denied,* 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981). The trial court, moreover, is afforded broad discretion in determining the admissibility of this evidence. *United States v. Vance,* 871 F.2d 572, 576 (6th Cir.) (quoting *United States v. Ebens,* 800 F.2d 1422, 1433 (6th Cir.1986)), *cert. denied,* 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989).

▬ Foster asserts that the trial court should not have admitted the Bass evidence because defense counsel was not timely notified; that the court did not adequately consider the prejudicial value to be weighed in such evidence under the federal rules; and that the court did not determine the relevancy of the evidence under Fed. R.Evid. 104(b).

We find no abuse of discretion on the notification aspect of Foster's objections. There was ample opportunity before trial to prepare for the consequences of this damaging evidence.[11] We also conclude that the district court considered carefully the admissibility of the evidence. The court reviewed "in camera" the sealed documents involved, made an informed ruling, and gave proper cautionary instructions. If Foster did commit prior bad acts, as alleged by the witness, evidence of such acts is certainly relevant. The issue is whether it was inadmissible character evidence. Under all the circumstances present, the district court did not err in admitting Bass' testimony.

## III. SUFFICIENCY OF THE EVIDENCE

Caldwell argues on this appeal that the evidence adduced was insufficient to convict him of the crimes charged. We review a claim that the evidence was insufficient to convict by determining " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Ellzey,* 874 F.2d 324, 328 (6th Cir.1989) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). All reasonable inferences must be drawn in the government's favor. *Id.*

Under the above standard, we conclude that the evidence was clearly sufficient to convict Caldwell. Caldwell argues that no evidence connected him with the Mercedes, and that although he may have been helping his first cousin, Emerson, there is no evidence that he knew of the marijuana in the truck or of the scheme to distribute it. He relies mainly on the proposition that "although a conspiracy case often rests [ ] on circumstantial evidence, a conviction cannot be obtained by 'piling inference upon inference.' " *Direct Sales Co. v. United States,* 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943). He claims that there was insufficient evidence from which a reasonable jury could infer that he conspired with the other defendants.

We believe that the evidence, viewed in a light most favorable to the government, was sufficient that a reasonable juror could have inferred Caldwell's involvement in the conspiracy. Three people testified at trial to incriminate him. The first two people were the passengers in the Chrysler on the night of the offense.

Terry Irby, the owner of the Chrysler and a passenger on the trip, testified that Caldwell offered her $1,000 to use her car to help Emerson move some furniture to New York. The purported purpose was to follow Emerson and drive him back from delivering the furniture. During the trip, Irby noticed the Mercedes also travelling along with the truck driven by Emerson. She also testified that, although she and Caldwell could have met Emerson in Sul-

11. We note that there was no motion to con- tinue.

phur Springs, Texas (on the way to New York), they made a detour of some 160 miles and met Emerson in Dallas, Texas, the opposite direction from New York, where Emerson had allegedly already loaded the truck with marijuana.[12] Also, Caldwell suspiciously rented a room in Dallas which he never used, and both he and his passengers purposefully stayed at a motel separate from that of the truck in Texarkana, Arkansas.

Irby's niece, Sandy Self, was a friend of Caldwell's and also a passenger in the Chrysler. When Self also noticed the Mercedes travelling with them, she asked Caldwell about it, and was told to mind her own business. She knew Foster through her association with Caldwell.

It should also be recalled that Coleman testified that he observed the three vehicles travelling together. He also saw the three vehicles pull to the side of the road so that the occupants come together to converse. Reasonable jurors might well believe that the group was travelling for a common purpose, but sought to conceal their association with the load of marijuana.

■ The jury had before it sufficient evidence from which it could have inferred that Caldwell was involved in and knew about the scheme to transport marijuana. Proof of a formal agreement is not required; it must only be proven that the members of the conspiracy had at least a tacit or material understanding to try to accomplish an unlawful goal. *United States v. Pearce,* 912 F.2d 159, 161 (6th Cir.1990); *United States v. Hughes,* 891 F.2d 597, 601 (6th Cir.1989).

■ Caldwell acted in a secretive and unusual manner in regard to this trip to New York. He paid Irby $1,000 to allow him to drive there to bring his associate back. A reasonable inference could be drawn that the purpose of Emerson's trip was to distribute the marijuana, and that Caldwell knew of and intentionally participated in the scheme. When considering the evidence in a light most favorable to

the government, there was adequate evidence to convict Caldwell of the crimes charged.

## IV. PRIOR CONVICTIONS USED TO ENHANCE SENTENCES

The district court used prior state court drug convictions to enhance the sentences of both Caldwell and Emerson. These two defendants argue that the district court erred in not considering or ruling on their challenges to the use of prior convictions in enhancing their sentences.

### A. *Caldwell*

■ Caldwell first contends that his prior New Mexico conviction was not "final" for purposes of imposing life sentence on him under 21 U.S.C. § 841(b)(1)(A). That statute provides for life imprisonment if certain crimes, such as the crime in this case, are committed "after two or more prior convictions for a felony drug offense have become final...." 21 U.S.C. § 841(b)(1)(A). Caldwell relies on the premise that a "final conviction" is one for which all avenues of direct appeal have been exhausted.

In this circuit, for purposes of determining the criminal history category under the sentencing guidelines, "[a] conviction is considered final[ ] at the time of the trial court's determination of guilt." *United States v. Beddow,* 957 F.2d 1330, 1337 (6th Cir.1992). We recognize that other circuits have held that under 21 U.S.C. § 841(b)(1)(A), enhancement may not occur "until all avenues of direct attack have been exhausted." *See, e.g., United States v. Lippner,* 676 F.2d 456, 467 (11th Cir. 1982); *Williams v. United States,* 651 F.2d 648 (9th Cir.1981); *United States v. Allen,* 566 F.2d 1193 (3d Cir.1977). This court has not had occasion to rule on the finality question under Title 21.

Caldwell raises this issue of finality for the first time on appeal. Caldwell did raise a question of the constitutionality of one of his past drug convictions, a question we

---

12. Irby and Caldwell denied knowing that the truck was loaded with marijuana. When the

officers stopped the truck, however, the odor of marijuana was at once detected.

will discuss separately, but he made no challenge on the finality question. He was not denied the opportunity to raise this question in the district court. He may have the opportunity to raise the finality challenge to his sentence in appropriate post-conviction proceedings. "Any challenge to a prior conviction, not raised by response to the information before an increased sentence is imposed in reliance thereon, shall be waived unless good cause be shown for failure to make a timely challenge." 21 U.S.C. § 851(c)(2). No such good cause for the failure to raise the finality question was shown by Caldwell in this case.

> Where the district court has offered the opportunity to object and a party is silent or fails to state the grounds for objection, objections to the sentence will be waived for purposes of appeal, and this court will not entertain an appeal based upon such objections unless refusal to do so would result in manifest injustice.

*United States v. Jones,* 899 F.2d 1097, 1103 (11th Cir.1990).

In this case, we consider for purposes of this appeal that Caldwell has waived the challenge now sought to be raised for the first time in his appellate brief. "Manifest injustice" does not result as a consequence of our treating his inaction as a waiver; he may move to vacate or correct the sentence if the finality requirement has not been met. *See Perez v. United States,* 445 F.2d 791 (5th Cir.1971).

■ Caldwell further argues that the district court erred in failing to grant him a hearing on the constitutionality of his state court conviction as is required under 21 U.S.C. § 851. Caldwell, unlike Emerson, was not sentenced pursuant to the guidelines. Rather, Caldwell was sentenced to a mandatory term of life imprisonment under the recidivist provision of 21 U.S.C. § 841(b). That provision reads: "If any person commits a violation of this subparagraph ... after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment...." 21 U.S.C. § 841(b). Consequently, Caldwell's argument on this issue differs from that of Emerson.[13]

Caldwell concedes the government notified him that his prior New Mexico drug conviction would be used to enhance his sentence, as is required under 21 U.S.C. § 851(a). The government timely filed an information, and Caldwell filed his response, claiming that his New Mexico conviction was constitutionally invalid because it "was the result of counsel who was operating under an unconstitutional conflict of interest due to his representation of both Mr. Caldwell and his co-defendant and who provided constitutionally ineffective assistance of counsel."[14] Caldwell argues that the district court was required to hold a hearing on his constitutional challenge to the state court conviction under the procedures outlined in 21 U.S.C. §§ 851(b) and (c). Specifically, § 851(c)(1) stated that "[t]he court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment." Further, § 851(c)(2) provides that "[a] person claiming that a conviction alleged in the information was obtained in violation of the Constitution of the United States shall set forth his claim, and the factual basis therefore, with particularity in his response to the information."

The district court below noted that "Mr. Emerson's issues come up strictly under the guidelines, while Mr. Caldwell's questions come up under 21 [U.S.C. § ] 851, which actually contains a provision concerning constitutional challenge to the prior convictions." The district court declined to conduct a hearing on the constitutionality of the defendants' state court convictions. For the reasons below, we find that

---

13. As will be discussed below, Emerson challenges the enhancement of his sentence based on his status as a career offender under the guidelines, not based on the enhancement under the recidivist provision of 21 U.S.C. § 841(b).

14. In his response, Caldwell relied on U.S.S.G. §§ 4A1.2, comment. (n. 6) and 4B1.2, comment. (n. 4) for support. As we have already stated, Caldwell was not sentenced pursuant to the guidelines, and these sections, therefore, are inapplicable.

the district court erred in failing to conduct a hearing on the constitutionality of Caldwell's state conviction, because that conviction was used to enhance his *statutory* minimum penalty under the recidivist provision of § 841(b).

This court has recently held that a district court is required to follow the mandatory procedures of § 851 when the government seeks to use a prior conviction to enhance a defendant's sentence. *United States v. Williams*, 899 F.2d 1526, 1529 (6th Cir.1990). In *Williams*, however, the defendant had been sentenced under the guidelines; his sentence was not enhanced under the recidivist provision of § 841(b).[15] *Williams* has been rejected by many other circuits because, in their view, the procedural requirements of § 851 do not apply when a defendant challenges the validity of a prior state court conviction when that conviction has been used to enhance the defendant's sentence under the career offender provision of the sentencing guidelines. *See* U.S.S.G. § 4B1.1. Those courts agree, however, that § 851 applies "to situations in which a convicted defendant's *statutory* minimum or maximum penalty is enhanced under Part D of Title 21." *United States v. Wallace*, 895 F.2d 487, 490 (8th Cir.1990) (emphasis in original) (analyzing § 851(a), the "notice" provision); *see also United States v. Whitaker*, 938 F.2d 1551, 1552 (2d Cir.1991); *United States v. Adams*, 938 F.2d 96, 99 (8th Cir.1991); *Young v. United States*, 936 F.2d 533, 535–536 (11th Cir.1991); *United States v. Novey*, 922 F.2d 624, 627–628 (10th Cir.1991), *cert. denied*, — U.S. —, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991); *United States v. McDougherty*, 920 F.2d 569, 574 (9th Cir. 1990), *cert. denied*, — U.S. —, 111 S.Ct. 1119, 113 L.Ed.2d 227 (1991); *United States v. Sanchez*, 917 F.2d 607, 616 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991); *United*

*States v. Marshall*, 910 F.2d 1241, 1245 (5th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 976, 112 L.Ed.2d 1061 (1991). Therefore, those circuits that conflict with *Williams* on whether § 851 applies in a guidelines case do not so conflict in a case, such as this, where the statutory minimum of the defendant was raised from 20 years to life imprisonment. Under all of the cases mentioned above, § 851 applies to Caldwell's situation. Further, "according to the language of the statute, section 851(a)(1) applies to persons 'convicted of an offense under this part [title 21]'." *Hansen v. U.S. Parole Commission*, 904 F.2d 306, 309 (5th Cir.1990) (quoting § 851(a)(1)), *cert. denied*, — U.S. —, 111 S.Ct. 765, 112 L.Ed.2d 784 (1991).

We find that the procedures of § 851 apply in this case, and that, consequently, the defendant was entitled to a hearing on the constitutionality of his state court conviction under the mandatory language of §§ 851(c)(1) and (c)(2). In *Williams*, this court stated that under the procedures of § 851, "the court must hold a hearing to resolve the issues raised by the response [of the defendant]." *Williams*, 899 F.2d at 1529. Accordingly, the district court erred in this regard, and we remand the case for a hearing on the constitutionality of Caldwell's state court conviction.

### B. *Emerson*

■ This court reviews the district court's application of the United States Sentencing Guidelines *de novo*. *United States v. Edgecomb*, 910 F.2d 1309, 1311 (6th Cir.1990).

Emerson bases his assignment of error on the language of U.S.S.G. § 4A1.2, comment. (n. 6). A district court must apply the version of the guidelines that was in effect "at the time of sentencing."[16] 18 U.S.C. § 3553(a)(4); *see United States v.*

---

**15.** It is unclear whether Williams' minimum statutory penalty was significant in his case, because he was sentenced pursuant to a plea agreement wherein he had agreed to be sentenced under the guidelines.

**16.** Because the date of sentencing and the date of the commission of the offense in this case

were both before the effective date of the amended guidelines, there is no *ex post facto* problem at issue. *See Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); *see also United States v. Green*, 952 F.2d 414, 415–417 (D.C.Cir.1991).

*Nagi*, 947 F.2d 211, 213 (6th Cir.1991); *see also United States v. Bell*, 953 F.2d 6 (1st Cir.1992). At the time of sentencing in this case, June, 1990, application note 6 to the commentary of U.S.S.G. § 4A1.2 read:

> 6. *Invalid Convictions.* Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted. Any other sentence resulting in a valid conviction is to be counted in the criminal history score. Convictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score. Also, if to count an uncounseled misdemeanor conviction would result in the imposition of a sentence of imprisonment under circumstances that would violate the United States Constitution, then such conviction shall not be counted in the criminal history score. Nonetheless, any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 if it provides reliable evidence of past criminal activity.

Although the above-quoted version of the comment to the guidelines is applicable in this case, such comment was amended, effective November 1, 1990, to read:

> 6. *Reversed, Vacated, or Invalidated Convictions.* Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted. Also, sentences resulting from convictions that a defendant shows to have been *previously ruled constitutionally invalid* are not to be counted. Nonetheless, the criminal conduct underlying any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 (Adequacy of Criminal History Category).

(emphasis added). The guideline background to the amended comment was also

changed to add the point that "[t]he Commission leaves for court determination the issue of whether a defendant may collaterally attack at sentencing a prior conviction." U.S.S.G. § 4A1.2, comment. (background). No published decision, we have discovered, has discussed the impact of this amendment. *See United States v. Day*, 949 F.2d 973, 980 n. 6 (8th Cir.1991) (listing cases that discuss the amendment but do not address its impact); and *United States v. Avery*, 773 F.Supp. 1400, 1403 (D.Or. 1991) (noting that no court has addressed the impact of the new version of the comment, but finding opinions that discuss the former version to be instructive). We find this amended comment to be instructive as to the meaning of the prior version of the guideline, particularly in light of the notes of the Sentencing Commission which state that "[t]his amendment *clarifies* the circumstances under which sentences are excluded from the criminal history score." U.S.S.G.App. C (n. 353) (emphasis added), *quoted in United States v. Nichols*, 763 F.Supp. 277, 279 (E.D.Tenn.1991). While we decide this issue under the older version of the guidelines, we look to the language of the new comment to support our decision.

The government's notice under 21 U.S.C. § 851 made reference to a New Mexico drug trafficking conviction dated August 16, 1988, as well as to a 1980 substantial drug conviction of both defendants.[17] Both Caldwell and Emerson were convicted in the New Mexico case; each objected to the use of that conviction because it was "the result of counsel who was operating under an unconstitutional conflict of interest" due to his representing both defendants in that case. Both defendants, however, entered guilty pleas in the state action, and Emerson alleged that "only" Caldwell paid the attorney, who was ineffective for failing to challenge the search and seizure of cocaine pursuant to a search warrant.[18]

---

17. The presentence report indicated that Emerson acted in conspiracy with Caldwell and others in drug trafficking in 1978 and 1979, and that Emerson flew an airplane to Mexico and returned with marijuana.

18. Emerson's memorandum indicated that the New Mexico Court of Appeals had deemed any challenge to the search and seizure to have been waived. The search warrant, asserted to be insufficient, was attached to Emerson's memo-

Emerson filed an affidavit on the date of the sentencing in this case which averred that the attorney "did not once discuss the possibility of my cooperating with the authorities against Caldwell or others." He received a sentence substantially less than Caldwell's sentence. Caldwell's affidavit indicated that his attorney, Mitchell, told the sentencing judge that he, Caldwell, was "more culpable in the offense." The presentence report indicates that Emerson and Caldwell were released on bond after their 1988 convictions. We find it particularly interesting that Emerson and Caldwell engaged in the instant drug conspiracy within two weeks after their New Mexico drug offense convictions were affirmed. Cooper, Caldwell's attorney in this case, stated in connection with the New Mexico drug offense:

> By way of background, if I might say, when Mr. Emerson and Mr. Caldwell were arrested, I believe it was November of '87, I was called back in my office in Dallas by Mr. Caldwell and totally advised him, first things first, tried to get him out of jail, which I was able to arrange through a JP in New Mexico, et cetera. And they both appeared in my office after they made bond, and I was retained to *represent them.* The procedures are such in New Mexico with efforts at the JP level and the information, I spoke with the prosecutor and a Criminal Information was filed and it was signed in District Court in Lincoln County, New Mexico.
>
> I communicated then with the District Court and, as he had told my clients during the arraignment where they appeared pro se, he advised me also, as the usual course, that I needed both counsel at a minimum and there would be *preferably separate counsel for each defendant.* And those efforts began then and continued for a number of months, approximately nine months.

> During the course of that nine months, I was listed on every document by the District Court and the prosecutor. I was provided discovery material. I was given notice of settings. I agreed to and signed off on motions to consolidate the cases, motions, three motions for continuance. In essence, at all times I was counsel. We were being pressed on to a trial date in, I believe, May of '88, and we were able to finally financially able to hire Mr. Jerry Mitchell in New Mexico. While we were going to do a joint defense, it was agreed that he would be counsel for Mr. Emerson and I would represent Mr. Caldwell. That was all—I don't represent to the Court that it was formally approved by the Trial Court but it was my understanding from both the court in prior conversations over the telephone, as well as with Mr. Mitchell.... I was well familiar with the procedures in that Court, that because there was local counsel representing—a New Mexico lawyer representing one of the defendants, that it would be no problem of my representing Mr. Caldwell at the trial. ... May trial had been continued until sometime in June and fixing to come to trial and communicating with Mr. Mitchell and my client. And all of a sudden, I get an order back from this judge denying it. Well, that threw Mr. Mitchell in an uproar, and my clients because—Mr. Caldwell because for nine months that was the program. Well, again, due to financial constraints, Mr. Mitchell said, well okay, that we couldn't hire anybody else. I told him I couldn't come over. So, Mr. Mitchell took over and filed an appearance on behalf of both of the defendants.

(emphasis added). For some nine months, Gary Mitchell, with knowledge of the facts and circumstances involved in the New Mexico case, apparently unsuccessfully filed a motion to challenge the search and seizure pursuant to the warrant. Neither

---

randum filed in the district court prior to sentencing. The New Mexico Court of Appeals affirmed the convictions in late December of 1988, and based its decision on the search and seizure question on procedural default or "abandonment," but added: "the search and seizure in the present case was *properly conducted* pursuant to a *valid* search warrant." (emphasis added). There is no indication in the record of a further state court appeal.

defendant indicated any problem or concern in the New Mexico case about a conflict of interest. Cooper, based on his own statement, felt no conflict of interest. At oral argument, neither Emerson nor Caldwell indicated any previous post-conviction effort in New Mexico after their convictions were affirmed.

Attorney Mitchell represented Emerson and secured for him, after a conditional guilty plea, a more favorable sentence than for Caldwell.[19] Emerson offered no evidence except his motions, memorandum, and his affidavit to support the collateral attack on the New Mexico conviction. His argument before the district court was based entirely on note 6, quoted above, and the district court ruled that the guidelines did not require a full fledged hearing based on collateral attacks on prior state court convictions, noting that "[t]he commentary which you have referred to is just that, its commentary. It's not a part of the guidelines." The district court specifically relied upon Judge Wilkinson's dissent in *United States v. Jones*, 907 F.2d 456 (4th Cir.1990), and also upon "reasons of finality, comity and federalism." Neither defendant has asserted that they were innocent of the New Mexico charges, and the record indicates abundant proof of their complicity.

We agree with the district court's summation of the law under U.S.S.G. § 4A1.2 and the commentary. Although this court has permitted district courts to hear challenges to the validity of prior state court convictions at sentencing, we have not held that a district court *must* hear such challenges. *See United States v. Bradley*, 922 F.2d 1290 (6th Cir.1991). We reject the reasoning of the majority in *Jones*, which held that district courts are *required* to entertain at sentencing a defendant's argument and his evidence to the effect that his state court conviction was unconstitutional, even though that defendant has not "shown [the conviction] to have been *previously ruled* constitutionally invalid." U.S.S.G. § 4A1.2 comment. (n. 3) (emphasis indicates 1990 addition). We find the reasoning of Judge Wilkinson's dissent in that case to be consistent with the guidelines and with the policies that underlie ideas of "finality, comity, and federalism."

▮▮▮▮ We recognize that "a conviction which is invalid for purposes of imposing a sentence of imprisonment for the offense itself remains invalid for purposes of increasing a term of imprisonment for a subsequent conviction." *Baldasar v. Illinois*, 446 U.S. 222, 228, 100 S.Ct. 1585, 1587, 64 L.Ed.2d 169 (1980) (Marshall, J., concurring).[20] The burden is upon the defendant to prove the invalidity and/or unconstitutionality of the prior conviction. *United States v. Bradley*, 922 F.2d 1290, 1297 (6th Cir.1981). In *Burgett v. Texas*, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), evidence introduced at trial on an enhanced penalty based on prior convictions indicated *on its face* that defendant had not been represented by counsel as to one such conviction. The Court held that such prior conviction, unconstitutional under *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), could not be used to support guilt or to enhance punishment. The state court conviction of Emerson was not unconstitutional on the face of the record utilized to enhance the sentence. Neither *Baldasar* nor *Burgett* require that the district court conduct a hearing in order to determine the constitutionality of the prior convictions under the circumstances of this case.

Emerson argues in his brief, again for the first time, that the district court, at the

---

**19.** Cooper stated to the court, in pertinent part, at sentencing before Judge Turner:

When I first appeared in this Court for arraignment, I believe, I was here on behalf of Mr. Emerson and Mr. Caldwell, and I stated to the Court that there would be counsel for Mr. Emerson independent of myself and that was fairly represented to the Court by telling that. The same scenario that happened in New Mexico. And albeit it was a nine month period, there was never any firm trial setting, and they had plenty scheduled there but they don't get to trial that quick. And when Mr. Mitchell was hired, *he was hired to represent Mr. Emerson....*

**20.** *Baldasar* involved the use of a misdemeanor conviction, without representation by counsel, in order to enhance a subsequent sentence on a felony conviction.

time of taking his guilty plea, incorrectly advised him of the potential effect of sentence enhancement under the guidelines. We do not ordinarily consider such an argument not first addressed to the district court and see no overwhelming requirement that we do so now. Emerson has not moved the district court to vacate his plea nor his sentence on this basis.

Emerson was still subject to his recent New Mexico conviction, recently affirmed, and his sentence imposed by the state court when the episode involved in the present case occurred. He is not precluded from making an appropriate collateral attack on his conviction in New Mexico because he was in custody (and presumably still is) under that sentence. *See Maleng v. Cook,* 490 U.S. 488, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989).

We, therefore, find no error in the district court's procedure in the sentencing of Emerson. We note, however, that if he is successful in collaterally attacking his 1988 conviction in New Mexico, he may then seek relief from his sentence in the United States District Court for the Western District of Tennessee.

In summary, we AFFIRM the convictions and sentences of Emerson, Foster, and French for the reasons stated. We REMAND Caldwell's case, however, for a hearing on the constitutionality of his New Mexico state court conviction.