# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1023
_____

United States of America

*Plaintiff - Appellee*

v.

Jerry D. Scott

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 25, 2015
Filed: April 1, 2016

_____

Before WOLLMAN, COLLOTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Jerry Scott appeals his conviction and sentence on several drug and firearms charges following a jury trial. He argues that five of the six convictions must be overturned because they were based on evidence obtained by police from two vehicle searches—one conducted on May 12, 2010, and the other on March 26, 2012—that he contends were illegal. He also argues there was insufficient evidence presented at

trial to support three of the six convictions. Finally, he claims that the sentence imposed by the district court was both substantively unreasonable and unconstitutional. Exercising jurisdiction over his appeal under 28 U.S.C. § 1291, and finding no reversible error, we affirm the judgment of the district court.[1]

I.

Scott was charged in a seven-count indictment. Counts 4–6 were based on evidence obtained from a May 12, 2010, search of his vehicle: possession with intent to distribute PCP in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Counts 1–3 were based on evidence obtained from a March 26, 2012, search of his vehicle: possession with intent to distribute PCP in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), being a felon in possession of a firearm in violation of 18 U.S.C §§ 922(g)(1) and 924(e), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Finally, Count 7 was based on an August 20, 2010, search of a house: possession with intent to distribute PCP in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Prior to trial, Scott moved to suppress the evidence obtained from both the May 12, 2010, and the March 26, 2012, vehicle searches. Both motions were denied after an evidentiary hearing.

At the conclusion of trial, Scott was acquitted on Count 6 (possession of a firearm in furtherance of a drug trafficking crime) and convicted of the lesser included offense of simple possession of PCP on Count 4, but was convicted on all the remaining counts.

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

A. May 12, 2010, Search

While on patrol the night of May 12, 2010, Kansas City Police Officer Mark McKenney saw a red Dodge Shelby Charger parked by the side of the road. In later testimony about the events of that night, McKenney said that he approached the Dodge from behind in his patrol car and, when he was about five to ten feet away, saw that its windows were down and smelled what he believed to be PCP. Nevertheless, instead of stopping, McKenney circled the block. When he returned, he found that the Dodge was gone.

Shortly afterwards, McKenney saw the same Shelby Charger again—and this time he pulled the car over. He approached the driver's side window and told the two men inside the car that they had been illegally parked when he had first passed. (In fact, they hadn't been: McKenney said he only told them they were to keep them calm.) He proceeded to ask the men something to the effect of, "Are you smoking that wet now?" "Wet" refers to PCP, and McKenney testified that he asked them if they were smoking it because he had smelled the odor of PCP and marijuana as he walked up to their window.[2] The two men in the car said no, they were just smoking marijuana. McKenney also reported seeing "green leafy residue" that he thought looked like marijuana on both their laps when he approached the car.

McKenney obtained identification from the two men in the car and found that the driver of the vehicle was Jerry Scott and the passenger was a man named Andre Christian. McKenney ran their names through the police car computer and discovered that Christian had three outstanding warrants, while Scott was listed as having engaged in aggressive acts toward law enforcement in the past. By that point, other officers had arrived, and McKenney asked one of the assisting officers to arrest

---

[2]McKenney's testimony was somewhat unclear on this point: he later testified that when he approached the Dodge the second time, the car's windows were up and he could not remember whether he smelled PCP.

Christian and put him in handcuffs. He also decided to have the Dodge towed, since the car was rented and he believed that having drugs in the car violated the rental agreement. He asked another officer to shine a flashlight on the door to help him locate the car's vehicle identification number. As they checked the door, both officers saw a gun in the door's side pocket. At that point, Scott was arrested. Before the car was towed, the officers searched the car and found two vials of PCP.

After charges were filed against him, Scott moved to suppress the evidence obtained in the May 2010 search. A magistrate judge held an evidentiary hearing and issued a report and recommendation, recommending that the motion be denied. Scott objected, arguing that a dashboard camera video showed that Scott's car window was rolled up during McKenney's first approach, not down as McKenney testified, and thus McKenney could not have detected an odor emanating from the car. On review, the district court watched the video and noted that "while it is not totally clear, there appears to be a reflection from street lights and/or lights from the patrol car, on the area of the passenger window that Officer McKenney testified was down. The reflection appears to indicate that at the time the image was captured, the window was at least partially up." Nevertheless, the district court concluded that "even if the window was raised as Officer McKenney passed, that does not dictate, by itself, whether Officer McKenney's testimony as a whole is truthful or not." The district court then adopted all of the magistrate judge's credibility findings, including McKenney's claim that he smelled PCP as he drove past the vehicle. It also adopted the magistrate judge's ultimate recommendation that the motion to suppress should be denied.

Scott's challenge to the May 12, 2010, search of his car turns on a factual issue: did McKenney smell PCP when he first passed Scott's car, or did he simply stop Scott based on a hunch that he was involved in illegal activity? If it was the former, reasonable suspicion existed to stop the car. See United States v. Gipp, 147 F.3d 680, 685 (8th Cir. 1998) (finding reasonable suspicion to investigate further when police

officer smelled odor of marijuana coming from defendant's car).  And after Scott and his passenger admitted smoking marijuana, police would have had probable cause to believe that the car contained contraband, see United States v. McCarty, 612 F.3d 1020, 1026 (8th Cir. 2010), permitting them to make a warrantless search of the car under the "automobile exception" to the warrant requirement, see Maryland v. Dyson, 527 U.S. 465, 466–67 (1999) (per curiam).[3]  If, on the other hand, McKenney had simply been acting on a "mere hunch," he would not have been permitted to pull Scott over, Navarette v. California, 134 S. Ct. 1683, 1687 (2014), and the evidence resulting from the stop would have to be suppressed.

The magistrate judge who held the evidentiary hearing believed McKenney when he testified that he smelled PCP when he first approached Scott's car, and the district court adopted all of the magistrate judge's factual findings.  On appeal, we review those findings of fact for clear error, and so long as a factual finding is "based upon 'a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.'"  United States v. Mendoza, 677 F.3d 822, 827 (8th Cir. 2012) (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985)).

Scott argues that there is independent evidence showing that at least part of McKenney's testimony was untrue:  McKenney was insistent that Scott's passenger side window was down when he first drove past, but Scott claims that the dashboard camera video from McKenney's car shows that the window was up.  The district court was inclined to agree that the window was at least partially up, but nevertheless credited the magistrate judge's determination that the rest of McKenney's

---

[3]The fact that the police officers were actually looking for the car's VIN rather than for drugs would not transform the search into an illegal one because, apart from a few exceptions not relevant here, an officer's motive does not invalidate objectively justifiable behavior under the Fourth Amendment.  See Whren v. United States, 517 U.S. 806, 811–13 (1996).

testimony—including his claim that he smelled PCP from Scott's car—was true. Having reviewed the video ourselves, we conclude that the district court's description of it is not clearly erroneous.

Insofar as the district court made a factual finding that the window was at least partly up, that does not prove that its factual finding that McKenney smelled the PCP in Scott's car on his first approach was clearly erroneous. True, there are some facts that cast doubt on his testimony. McKenney testified that he smelled what he believed to be PCP in Scott's car while sitting in his own patrol car about five to ten feet behind Scott. Yet McKenney conceded that when he approached the car the second time, the windows were up, and he could not remember whether he could smell PCP on that occasion. When asked on cross-examination whether he could smell the PCP contained in a sealed can on the government's table in the courtroom, McKenney said he could not. But this evidence is not necessarily inconsistent with the possibility that McKenney did, in fact, smell the PCP in Scott's car on his first approach, particularly if the vials of PCP in Scott's car were open, unlike the sealed can of PCP on the government's table. Whether we would come to the conclusion in the first instance that McKenney smelled PCP in two vials inside Scott's car when sitting in his own car five to ten feet away is not the question before us. We hold only that the district court's factual findings cannot be set aside, given the deference we owe them. United States v. Wright, 512 F.3d 466, 471 (8th Cir. 2008) (holding that a district court's credibility determinations "require a high degree of deference").

Because McKenney's initial stop of Scott's car was lawful, we affirm the district court's denial of his motion to suppress the evidence obtained from the subsequent search.

B. March 26, 2012, Search

In the spring of 2012, Detective Brian Tomanio of the Kansas City Police Department received information from a confidential source, who had been detained as part of a separate drug investigation. The confidential source said that he or she knew an individual named Jerry Scott who lived in the area of 40th Street and Woodland Avenue in Kansas City, and who was known to sell PCP and carry a firearm—though the source had never personally seen Scott selling any drugs. The confidential source described Scott's approximate height and weight, and said he drove a black Lincoln Navigator. At the time he received this information, Tomanio had never previously worked with the confidential source.

Tomanio ran some computer searches and determined that a Jerry Scott did own a black Lincoln Navigator and lived at 3937 Woodland Avenue—an address near the intersection with 40th Street. He also determined that Scott did not have a valid driver's license, and had a prior criminal history involving drugs and weapons—specifically, arrests or convictions for possession of a controlled substance and for being a felon in possession of a firearm. The computer searches also yielded a photo of Scott.

At this point, Tomanio began surveilling the residence at 3937 Woodland Avenue, and noted a black Lincoln Navigator parked in front on multiple occasions. On March 26, 2012, while watching the house, Tomanio saw Scott and a woman leave the house and get in the Lincoln—Scott in the driver's seat, and the woman in the front passenger seat. When Scott and the woman drove off in the car, Tomanio contacted Officers Chad Pickens and Jason Cramblit of the Kansas City Police Department, and asked them to stop the Lincoln Navigator because Scott did not have a valid driver's license. He had previously told the two officers that Scott was being investigated for selling PCP, that he was usually armed, and that he was a convicted felon.

Pickens and Cramblit used their police car computer to pull up a photo of Scott and verify that his driver's license was invalid, and then they stopped the Lincoln Navigator. Cramblit walked to the driver's side door, but the front driver's side window would not roll down. He was forced instead to talk to Scott through the rear driver's-side window, which itself only went down a little more than halfway. Because all the windows were tinted, Cramblit was unable to get a full view of the interior of the car. Both officers testified that they smelled a strong scent of cologne or perfume coming from inside the car.

Cramblit asked Scott for his license and testified that after an "abnormal amount of time," Scott provided it. When Cramblit saw that it was expired, he asked Scott to exit the vehicle, patted him down, and had him stand on the curb. The passenger also exited the car. Meanwhile, Pickens went back to the police car, ran the names of both Scott and his passenger through the police car computer, and found that the passenger had at least three outstanding city warrants. Although the officers believed they could arrest both Scott and his passenger at this point (for driving on an expired license and for having outstanding warrants, respectively), they decided instead to write tickets and release them.

Pickens then told Scott that he was going to write some tickets and that he was going to make sure that there were no weapons in the passenger compartment of the vehicle, because he planned to have Scott and his passenger sit in the car while the tickets were written up. Scott did not immediately respond. Cramblit testified, however, that about five to ten seconds after Pickens opened the passenger front door, Scott told him something like, "Hey, I don't know if I like you all going through my vehicle." At that point, Cramblit called out, "Hey, Pick,"—referring to his partner, Pickens—and arrested Scott for not having a valid driver's license and insurance, as well as having an improper video screen on his dashboard. Scott's passenger was also arrested on the outstanding warrants. Unbeknownst to Cramblit, shortly before he said, "Hey, Pick," Pickens had located a firearm and what appeared to be PCP in the

center console of the Lincoln. After seeing that both Scott and his companion were being put under arrest, Pickens searched the entire car and found additional drugs and another gun. The officers then had the Lincoln Navigator towed. After charges were filed, Scott moved to suppress the evidence gathered in the search. Following an evidentiary hearing, the district court denied the motion.

The district court concluded that the March 26, 2012, search could be justified as a "protective sweep" under Michigan v. Long, 463 U.S. 1032 (1983). That case held that when police officers have reasonable suspicion to conclude that the driver of a car is armed and dangerous, they are entitled to search not only the driver's person but also the driver's car for any weapons that might endanger the officers. Long, 463 U.S. at 1045–52.

Scott first argues that the rule derived from Long was limited by the Supreme Court's decision in Arizona v. Gant, which held that police officers can only search a vehicle incident to a lawful arrest if the arrestee has access to the vehicle's passenger compartment or if it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle. 556 U.S. 332, 343 (2009). But it is undisputed that Scott was not under arrest at the time Pickens searched his car and found drugs and a gun, and we have rejected the notion that Gant's requirements apply when no arrest has taken place. See United States v. Morgan, 729 F.3d 1086, 1089–90 (8th Cir. 2013); United States v. Smith, 645 F.3d 998, 1002 n.3 (8th Cir. 2011) (citing Gant, 556 U.S. at 352 (Scalia, J., concurring)); United States v. Goodwin-Bey, 584 F.3d 1117, 1120–21 (8th Cir. 2009).

Scott also argues that the police did not have reasonable suspicion to conclude that he was armed and dangerous. The government relies on several factors to say otherwise. Whether or not each factor present in this case, standing alone, was sufficient to justify the protective sweep, we agree with the district court that the facts taken as a whole justify the search of Scott's car. In evaluating reasonable suspicion,

we look at whether the facts collectively provide a basis for reasonable suspicion, rather than whether each fact on its own does so.  United States v. Peoples, 925 F.2d 1082, 1085 (8th Cir. 1991).  Even factors that, when considered individually, are consistent with innocent travel can, when taken together, amount to reasonable suspicion.  United States v. Sokolow, 490 U.S. 1, 9–10 (1989).  When viewed as a whole, we conclude that the facts known to the police officers did give rise to reasonable suspicion that Scott might be dangerous if allowed to reenter his car.

At the time of the protective sweep, the officers had information that Scott had a prior criminal record involving drugs and firearms.  Exactly which of Scott's convictions the police considered at the time is unclear from the record, but whichever they were, those convictions occurred several years prior to his March 26, 2012, arrest. Scott's most recent convictions involving violence were two 2008 convictions for domestic assault; and the last firearm conviction was for being a felon in possession of a firearm in 2000.  These were four years and twelve years, respectively, before the stop at issue.  He had been arrested for drug possession and being a felon in possession of a firearm based on the evidence seized during the May 2010 stop recounted earlier, but he had not yet been convicted of those offenses.  There is no bright-line test for determining when information used to justify a protective sweep is too stale to be relevant, and this determination cannot be based simply on counting the number of days between the present offense and the prior conviction.  See United States v. Stachowiak, 521 F.3d 852, 856 (8th Cir. 2008).   Yet, at some point the conclusions that can be drawn from a conviction or arrest are too attenuated to play a role in determining whether a protective sweep is justified.  While we recognize that the age of Scott's convictions is a factor to consider in determining their relevance, we conclude that the convictions here were not too remote in time to contribute to the officers' reasonable suspicion that Scott was armed and dangerous.

In addition, Tomanio's confidential source told him that Scott was known to sell PCP and carry a firearm, and that information was relayed to the officers.  The

confidential source had never personally seen Scott carry a firearm or sell drugs, but the officers were entitled to rely on this information, in combination with other facts, to conclude that reasonable suspicion existed to search Scott's car. Tomanio was able to corroborate various aspects of the source's account through surveillance and computer searches, like the fact that Scott did, in fact, drive a black Lincoln Navigator, and lived in the area the source claimed. See United States v. Winarske, 715 F.3d 1063, 1067 (8th Cir. 2013) ("[I]f an informant is otherwise unknown to police and has no proven track record of reliability, police may deem an informant credible and make a finding of probable cause when an informant's information is at least partly corroborated."); United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001) ("Even 'the corroboration of minor, innocent details can suffice to establish probable cause.'" (citation omitted)). In addition, the confidential source's identity was known to police, as he or she had been detained as part of a separate drug investigation. "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." United States v. Kent, 531 F.3d 642, 648–49 (8th Cir. 2008). Since the confidential source in this case was not anonymous, less corroboration was required. Id. at 649.

In addition to Scott's criminal record and the information from the confidential source, the officers were faced with a situation where they had limited visibility into Scott's car, making it more difficult for them to verify that it would be safe to let him reenter. The car's windows were heavily tinted, and none of the windows would roll down all the way, heavily obstructing the officers' views into the car. The poor visibility into the car gave police officers additional reason to suspect that letting Scott and his passenger back into the car might be dangerous. Cf. United States v. Newell, 596 F.3d 876, 880 (8th Cir. 2010) ("The officers were not required to hope [the defendant] was not arming himself behind the heavily-tinted windows while they asked him to roll down the window . . . .").

Scott correctly points out that it was the officers' own decision to have Scott and his passenger wait in the car while they wrote up the tickets. He contends that officers should not be allowed to create a risky situation and then use that situation to justify a protective sweep. But even if the officers had written up the tickets while Scott and his passenger waited on the curb, they eventually would have had to let them reenter the car, where firearms might have been hidden. See Long, 463 U.S. at 1051–52 ("[I]f the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside."); United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011) ("[I]t is settled that once reasonable suspicion is established, a protective search of a vehicle's interior is permissible regardless of whether the occupants have been removed from the vehicle."). We are mindful of Scott's concern, but do not believe it carries the day in this case.

When viewed as a whole, the particular combination of circumstances known to the officers was sufficient to justify the search of Scott's car as a protective sweep. As a result, we need not reach the government's alternative argument that the search could be justified under the inevitable discovery doctrine.

Scott also challenges whether there was sufficient evidence to support his convictions for possession with intent to distribute PCP and possession of a firearm in furtherance of a drug trafficking crime based on the evidence obtained on March 26, 2012. We find that the evidence was sufficient to support those convictions. Police found an eye dropper, More brand cigarettes, and a bottle of PCP in Scott's Lincoln Navigator. The government presented testimony from Detective Tomanio, who had investigated ten to twenty drug cases involving PCP, that More brand cigarettes and eyedroppers are associated with the distribution of PCP: eye droppers are often used to drop PCP onto More brand cigarettes prior to distribution. The government also presented testimony from Detective Doug Blodgett of the Jackson County Drug Task Force, who said that eye droppers are often used to transfer PCP into smaller vials for distribution. Moreover, police found two firearms close to the

drugs, and Pickens testified that he often found guns and drugs together when investigating drug traffickers. We have found similar evidence sufficient to support convictions for possession of a firearm in furtherance of a drug trafficking crime. See United States v. Parish, 606 F.3d 480, 490 (8th Cir. 2010). Consequently, we deny his sufficiency challenges to these counts.

C. August 20, 2010, Search

Scott was also convicted of one count of possession with intent to distribute PCP based on evidence obtained from an August 20, 2010, search of a house at 4332 Bales Avenue in Kansas City. Evidence regarding this search was presented at trial through the testimony of Detective Blodgett. Blodgett testified that after obtaining a knock-and-announce warrant the morning of August 20, police made a forced entry into the house at 4332 Bales Avenue. At the time the warrant was issued, the only information Blodgett had about the target of the warrant was that he was "a black male known as Jay," who Blodgett said was later determined to be Jerry Scott. The information was apparently obtained from a confidential informant who did not testify at trial. At the time the police entered the house, no occupants were present.

The search of the house turned up two large bottles of PCP, various vials of PCP, and More brand cigarettes. Blodgett testified that the amount of PCP found was consistent with distribution, rather than use, as was the eyedropper police found on the premises—eyedroppers being often used to transfer PCP into smaller vials, according to Blodgett. The police also found several pieces of mail, including a utility bill addressed to Scott, and a lease for the residence that had been signed three months previously and listed Scott as a lessee along with another individual named Lielah Hudson. Other pieces of mail found in the house, however, were addressed to Scott but featured a different (though nearby) address, 4342 Bales Avenue, where Scott lived. These included a traffic ticket, a vehicle registration, and mail from the Missouri Department of Corrections Board of Probation and Parole.

In order to support a conviction for possessing a controlled substance with intent to distribute based on the drugs discovered during the August 20, 2010, search of the property at 4332 Bales Avenue, the government had to show that Scott possessed the controlled substance and intended to distribute it. See United States v. Thompson, 686 F.3d 575, 583 (8th Cir. 2012). Because Scott did not have the drugs in his actual possession, the government had to show that he constructively possessed the distribution-quantity PCP found in the house. United States v. Howard, 427 F.3d 554, 557 (8th Cir. 2005). To prove constructive possession, the government must show that the defendant had "ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband [was] concealed." United States v. Stevens, 439 F.3d 983, 989–90 (8th Cir. 2006).

The government asserts that the jury could legitimately conclude that Scott had dominion over the premises because he (along with another person) was listed as a lessee, because there was mail, including a utility bill, addressed to him, and because police had information from a confidential informant that a man named "Jay" was selling PCP from 4332 Bales Avenue, who Blodgett testified was later determined to be Scott. We have previously held that "where there is joint occupancy of a residence, dominion over the premises by itself is insufficient to establish constructive possession." United States v. Wright, 739 F.3d 1160, 1168 (8th Cir. 2014) (citing United States v. Wajda, 810 F.2d 754, 762 (8th Cir. 1987), and United States v. Mudd, 685 F.3d 473, 477 (5th Cir. 2012)). Here, Scott did not even have joint occupancy over the house—the government conceded that he lived in another house nearby. But this was not the only evidence potentially relevant to constructive possession that the jury heard. This count was only one of several drug-related charges that were tried together. As a result, the jury also heard evidence that three months earlier, in May 2010, Scott had been arrested after PCP was found in his car.[4] The government also

[4]We note that the jury found Scott guilty of the lesser-included offense of possession of PCP on Count 4.

-14-

presented evidence that Scott had PCP in his car again in March 2012. At trial, Scott did not ask for the count arising out of the August 2010 search to be severed from either of the other counts charging him with possession of PCP with intent to distribute. See Fed. R. Crim. P. 14(a). Nor does he contend on appeal that severance was required. In short, the jury heard without objection that Scott had possessed PCP before and after August 2010, that Scott was a co-lessee of a house where distribution-level quantities of PCP were found, and that a confidential informant told police that 'Jay' (i.e., Scott) was selling PCP from that house. Together, that evidence was sufficient for the jury to find that he constructively possessed the PCP found at 4332 Bales Avenue, and to find him guilty of this count.

## D. Sentencing

At Scott's sentencing hearing, the district court, applying a career offender enhancement, imposed concurrent sentences of 240 months' imprisonment for the two convictions involving possession with intent to distribute PCP, concurrent sentences of 300 months for the two felon-in-possession-of-a-firearm convictions, a concurrent 12-month sentence for possession of PCP, and a consecutive 60-month sentence for possession of a firearm in furtherance of a drug trafficking crime, resulting in a total sentence of 360 months.

At the time of sentencing before the district court and during the initial briefing on appeal, Scott's only challenge to his 360-month sentence was that it was substantively unreasonable. Shortly before oral argument, however, he moved to file a supplemental brief on whether one of the provisions of the United States Sentencing Guidelines used by the district court in sentencing him was unconstitutionally vague. We granted the motion, and supplemental briefs have been filed.

The district court found Scott to be a "career offender" under the Sentencing Guidelines, meaning he had "at least two prior felony convictions of either a crime of

violence or a controlled substance offense." USSG § 4B1.1. A "crime of violence" in turn is defined as an offense that (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another"; (2) is enumerated in the Guidelines or accompanying commentary as a crime of violence; or (3) "otherwise involves conduct that presents a serious potential risk of physical injury to another." USSG § 4B1.2(a)(1)–(2). The district court found that Scott's two prior convictions for second-degree domestic assault and his prior conviction for second-degree robbery qualified as crimes of violence under clause (3), the "residual clause." The Supreme Court recently held that the identically-worded residual clause that forms part of the definition of the term "violent felony" in the Armed Career Criminal Act (ACCA) was unconstitutionally vague, Johnson v. United States, 135 S. Ct. 2551, 2557 (2015), and Scott argues that the residual clause found in the career offender guidelines is too.

The government does not dispute that the residual clause of USSG § 4B1.2(a)(2) is unconstitutionally vague, but argues that even if the district court erred by relying on the residual clause, the error was harmless since Scott's two domestic assault convictions and his robbery conviction also qualify as crimes of violence under clause (1), the "use of force" clause. Under binding circuit precedent, the government is correct.

The Missouri statute that provided the basis for Scott's two second-degree domestic assault convictions criminalizes the following conduct:

> (1) Attempt[ing] to cause or knowingly caus[ing] physical injury to [a] family or household member by any means, including but not limited to, by use of a deadly weapon or dangerous instrument, or by choking or strangulation; or
>
> (2) Recklessly caus[ing] serious physical injury to [a] family or household member; or

-16-

> (3) Recklessly caus[ing] physical injury to [a] family or household member by means of any deadly weapon.

Mo. Rev. Stat. § 565.073.1. The indictment showed that Scott was convicted under subsection (1) for both convictions, and Scott concedes that he "was charged under subsection (1) of the second-degree domestic assault statute."

We recently interpreted the "use of force" clause of USSG § 4B1.2 as covering any offense that required intentionally or knowingly causing "physical injury," as Arkansas defines that term. See United States v. Rice, No. 14-3615, 2016 WL 537589, at *2–3 (8th Cir. Feb. 11, 2016). But see id. at *3–4 (Kelly, J., dissenting). Arkansas defined "physical injury" to mean "(A) Impairment of physical condition; (B) Infliction of substantial pain; or (C) Infliction of bruising, swelling, or visible marks associated with physical trauma." Id. at *2 n.2 (quoting Ark. Code Ann. § 5-1-102 (2006)). At the relevant time period, Missouri defined "physical injury" to mean "physical pain, illness, or any impairment of physical condition." Mo. Rev. Stat. § 556.061 (2006). These two definitions are similar enough that Rice is not meaningfully distinguishable. Since, under Rice, Scott's two convictions for second-degree domestic assault constitute "crimes of violence," he was properly found to be a "career offender" under USSG § 4B1.1. As a result, we need not reach the constitutionality of the residual clause of § 4B1.2(a)(2).

We also find that the district court's sentence of 360 months' imprisonment was not substantively unreasonable. We "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Gall v. United States, 552 U.S. 38, 51 (2007). Scott's 360-month sentence, undoubtedly long, was nevertheless at the bottom of his Sentencing Guidelines range of 360 months to life imprisonment. In imposing the sentence, the district court properly considered the factors set forth at 18 U.S.C. § 3553(a), including Scott's prior history of firearm possession and other offenses and the ineffectiveness of the prior punishments he had received. As a result,

we cannot find that the district court's within-Guidelines sentence was an abuse of discretion.

## II.

The judgment of the district court is affirmed.

_____