# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 20-3467

———————————————

United States of America

*Plaintiff - Appellee*

v.

Vernon Shumaker

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Southern District of Iowa - Central

——————————

Submitted: September 24, 2021
Filed: December 29, 2021

——————————

Before SMITH, Chief Judge, GRUENDER and STRAS, Circuit Judges.

——————————

SMITH, Chief Judge.

Vernon Shumaker conditionally pleaded guilty to one count of being a felon and drug user in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(3), and 924(a)(2), after the district court denied his motion to suppress evidence. Shumaker had moved to suppress evidence gathered during a stop and search of his vehicle. Shumaker argued that the officers lacked reasonable suspicion

to stop him because they could not have smelled marijuana while driving behind him. Alternatively, he argued that even if the officers smelled marijuana, they did not have a particularized suspicion that the smell was emanating from *his* vehicle. The district court[1] denied the suppression motion. It found credible the officers' testimony that they smelled marijuana while driving behind Shumaker and further found that the officers' suspicion was particularized to Shumaker's vehicle. Shumaker now appeals the district court's denial of the suppression motion. We affirm.

## I. *Background*
### A. *Facts*

This case depends heavily upon its facts. A thorough factual summary is therefore in order. For a six-month period each year (spring to fall), the Des Moines Police Department (DMPD) operates a Special Enforcement Team (SET). The last day that the SET operated in 2019 was October 5, 2019. The SET does not take service calls; instead, it patrols high-crime areas to actively search for criminal activity. The goal of the SET is "to make as many stops as possible within the legal realm to have interaction with people, to attempt to seize narcotics, people with warrants, and/or firearms." R. Doc. 38, at 20.

SET Officers Ryan Steinkamp, Brian Minnehan, and Ryan Garrett (collectively, "the officers") are familiar with the smell of marijuana because they encounter it frequently. According to Officer Minnehan, when an officer encounters a marijuana odor while driving, the officer attempts to identify the odor's source by following the vehicle believed to be the odor's source and observing whether the odor remains constant. If the odor dissipates, then the officer does not stop the vehicle.

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

On October 5, 2019, the officers were on patrol in a marked squad car. Officer Steinkamp drove the car, Officer Garrett sat in the front seat, and Officer Minnehan sat in the back seat. The squad car's front windows were up, but its back windows were down. At 5:49 p.m., the officers were driving westbound on a city street behind a black sedan that had its windows up. According to weather records, the wind was traveling between 13 and 17 miles per hour. The officers did not smell marijuana while driving behind the black sedan.

As the officers approached a four-way intersection, they saw a red Chevrolet Impala traveling eastbound abruptly turn left in front of the oncoming black sedan. The Impala's "passenger side window was down." *Id.* at 38. At the intersection, the officers turned right and started driving northbound on the same street as the Impala.

Shortly after making the right turn, the officers "started smelling the odor of marijuana, and that's what drew [their] attention" to the Impala. *Id.* at 39. The squad car was approximately 100 meters behind the Impala when the officers first smelled the odor. The Impala was in the left lane, while the squad car was directly behind the black sedan in the right lane. The officers did not believe that the black sedan was the odor's source because its windows were up and they never smelled marijuana while following the black sedan before turning right.

Officer Steinkamp testified that the marijuana odor was "burnt marijuana" based on his "training and experience." *Id.* at 43; *see also id.* at 51 (confirming that he "believed it was burning marijuana [that he] smelled"); *id.* at 53 (stating that the officers "started smelling marijuana"). Officer Minnehan likewise testified that he believed he "was smelling burnt marijuana." *Id.* at 65; *see also id.* at 71 (confirming that he "smelled what [he] believed to be burning marijuana" "shortly after [the squad car] turned north"); *id.* at 73 (confirming that he "smelled burnt marijuana"); *id.* at 76 ("I believe I was smelling burnt marijuana."). Officer Garrett's statements captured on

video footage "indicate that he[,] too[,] believed he smelled burnt marijuana." R. Doc. 49, at 4 (citing Gov't's Ex. 2-C, at 17:58–18:02).

The officers changed lanes and sped up to position the squad car close behind the Impala in the left lane. A black truck was immediately in front of the Impala. An SUV was farther ahead in the right lane. The road was busy at that time. The officers drove directly behind the Impala "for several blocks"—approximately 30 seconds—to "make sure that [they] kn[e]w for certain without a shadow of a doubt that [it was the] vehicle that has the odor of marijuana emitting from it." R. Doc. 38, at 40. "[T]he odor of marijuana remained constant" after the officers followed the Impala "for several more blocks." *Id.* at 64. The officers could see inside the Impala while following behind it and never saw smoke inside the car or coming out of the car. Nonetheless, based on the smell of "burnt marijuana," the officers "believe[d] that somebody in the car was actively smoking marijuana." *Id.* at 65. As a result, the officers decided to conduct a traffic stop of the Impala and activated the squad car's lights. The Impala pulled over to the side of the road.

The officers continued to smell marijuana emanating from the Impala after the stop. Officer Steinkamp, while preparing to exit the squad car, commented that "[i]t still reeks of weed." *Id.* at 28. Officer Steinkamp testified that the marijuana odor grew "[s]tronger" as he approached the Impala. *Id.* at 31. Officer Minnehan testified that "[w]hen [he] got close to the vehicle, [he] could clearly detect [the smell of marijuana] coming strongly from inside the vehicle." *Id.* at 65. Officer Garrett testified that "[a]s [he] approached the passenger's side of the vehicle, [he] could still smell the odor of marijuana." *Id.* at 83.

Officers Steinkamp and Minnehan went to the Impala's driver's side. Officer Garrett went to the Impala's passenger's side. Officer Garrett saw a digital scale in the pouch behind the passenger's seat. Officer Steinkamp directed Shumaker to step out of the car. Shumaker complied. Officer Minnehan asked Shumaker, "Do you got a

-4-

bunch of weed in here, or were you just smoking and driving?" R. Doc. 49, at 5 (quoting Gov't's Ex. 1, at 1:45–1:47). Shumaker responded, "Nah, just smoking. Not too long ago though." *Id.* (quoting Gov't's Ex. 1, at 1:48–1:49). Officer Steinkamp then asked, "Smoking weed?" *Id.* (quoting Gov't's Ex. 1, at 1:50–1:51). Officer Minnehan commented, "As we were behind you, it reeks like weed." *Id.* at 6 (quoting Gov't's Ex. 1, at 1:50–1:52). Shumaker denied smoking marijuana in the car. Officer Minnehan then stated, "I can still smell it." *Id.* (quoting Gov't's Ex. 1, at 1:55–1:56). Shumaker responded, "Yeah." *Id.* (quoting Gov't's Ex. 1, at 1:56–1:57). Officer Minnehan inquired if there was anything illegal in the car. Shumaker answered that his girlfriend's gun was in the vehicle.

Officer Steinkamp handcuffed Shumaker and moved him to the squad car, while Officers Garrett and Minnehan searched the Impala. Upon his entry into the vehicle, Officer Garrett continued to smell a marijuana odor, commenting, "It's strong," to which Officer Minnehan replied, "It is." Appellee's Br. at 5 (quoting Gov't's Ex. 3, at 3:08–16). Officer Minnehan saw a closed-container ashtray in the front seat's cupholder. The ashtray had a lid with a small hole in the center; its contents were not visible. Officer Minnehan removed the lid and found several partially smoked marijuana cigarettes and ash. Officer Minnehan identified a "larger piece [that did] not have any ash on it. It[] [was] sitting on top of all the ashes." R. Doc. 38, at 69. Officer Minnehan observed that "the paper it[] [was] wrapped in [appeared] fresher than all the other ones." *Id.* Officer Minnehan commented to Officer Garrett, "Oh here you go, Garrett. He was smoking and driving." R. Doc. 49, at 6 (quoting Gov't's Ex. 3, at 3:28–3:32). Officer Minnehan then exited the Impala and advised Officer Steinkamp, "There's a blunt half full of weed in there. He was definitely smoking and driving." *Id.* (quoting Gov't's Ex. 3, at 3:56–4:01).

In addition to the marijuana cigarettes, the officers also recovered a digital scale with trace amounts of marijuana residue on it and a loaded nine-millimeter pistol in the center console. They did not find embers or smoke in the ashtray or a lighter.

While Officers Garrett and Minnehan searched the Impala, Officer Steinkamp stayed with Shumaker in the squad car. Shumaker denied smoking and driving. In response, Officer Steinkamp stated, "While I was behind you, all three of us, we could smell it." *Id.* (quoting Gov't's Ex. 1, at 4:03–4:07). Shumaker responded, "I wasn't smoking and driving though." *Id.* (quoting Gov't's Ex. 3, at 4:08–4:09). According to Shumaker, he had smoked marijuana before leaving his house but was not smoking while driving. After several minutes passed, Shumaker again insisted that he did not smoke and drive. Officer Steinkamp remarked, "Say what you want, but we know what we smelled." *Id.* at 6–7 (quoting Gov't's Ex. 3, at 9:55–9:58). Shumaker retorted, "You can smell it all you want, but there's no smoke in the car." *Id.* at 7 (quoting Gov't's Ex. 3, at 9:59–10:01). Officer Steinkamp replied, "But that marijuana blunt inside the car?" *Id.* (quoting Gov't's Ex. 3, at 10:02–10:03). Shumaker answered that the marijuana roaches were old.

Officer Steinkamp exited the squad car and placed his notepad on the car's hood while awaiting the results of Shumaker's criminal history check. Video footage shows the wind blowing the pages of the notepad toward the car's windshield. Based on the pages' movement, Officer Steinkamp testified that the wind was "blowing upwards from the north to the south direction." R. Doc. 38, at 36; *see also id.* at 37 (testifying that wind was blowing "[n]orth to south"). Officer Minnehan "believe[d] the wind was kind of swirling a little bit that day" but noted that "several times the paperwork was blowing as the wind was blowing north to south." *Id.* at 76–77.

Officer Garrett also spoke with Shumaker in the squad car. Shumaker stated to Officer Garrett that he had not smoked in the car; instead, he had smoked right before getting into the car. After a few minutes, Officer Garrett commented, "So that roach was not from today? Because it sure was strong." R. Doc. 49, at 7 (quoting Gov't's Ex. 2-C, at 17:58–18:02). Shumaker answered, "No, bro. I smoke strong weed, that's why." *Id.* (quoting Gov't's Ex. 2-C, at 18:02–18:05).

## B. *Procedural History*

Based on the firearm found in the Impala, Shumaker was charged with one count of being a felon and drug user in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(3), and 924(a)(2). Shumaker moved to suppress all evidence derived from the traffic stop.

At the suppression hearing, the officers testified consistently with the fact recitation above. Additionally, both parties introduced expert testimony concerning the officers' ability to smell marijuana emanating from Shumaker's car while driving behind him. Dr. Richard L. Doty, the Director of the Smell and Taste Center at the University of Pennsylvania Medical Center testified as Shumaker's expert. Dr. Doty testified about his research projects concerning raw marijuana.[2] Thereafter, he testified that, based on his review of the evidence and his experience, the officers would have been unable to smell the marijuana in Shumaker's ashtray while driving behind him. Dr. Doty reached his conclusion based on the "very small amount of marijuana" recovered, the marijuana's placement "inside a closed container inside an automobile," "the barriers inside a patrol car, the distances [between the vehicles], traffic," "the turbulence of the other cars, [and] the wind direction." R. Doc.38, at 98–99. As to the wind direction, Dr. Doty relied on local weather reports in testifying that the wind on the day of the stop was blowing "west to east—south—west to southeast." *Id.* at 98.

Dr. Doty also opined that the officers could not have smelled a marijuana odor coming from Shumaker's vehicle even if Shumaker had smoked the marijuana before entering his vehicle, had smoked in his vehicle prior to driving, or had smoked while driving in front of the officers. Dr. Doty's conclusions were again based on the

---

[2]For example, Dr. Doty testified that in one double-blind study, a bag of marijuana was placed in the back of a vehicle during some trials, while in other trials newspaper was placed in the back of the vehicle. Dr. Doty determined "that under those circumstances you could not smell marijuana outside an automobile." R. Doc. 38, at 94–95.

distance between the cars, the turbulence, the wind, and the officers' placement in the squad car.

Finally, Dr. Doty testified that the officers could not have pinpointed the source of the odor even if they had smelled marijuana while driving behind Shumaker because of the presence of other cars, the surrounding vegetation, and the wind. Dr. Doty confirmed that his opinions were "all . . . to a reasonable degree of scientific certainty." *Id.* at 101.

On cross-examination, Dr. Doty conceded that "[u]nder some circumstances" "the wind can carry molecules, making it easier to detect the smell." *Id.* at 103. He further admitted that because the wind "was highly variable [the] day [of the stop], it could have been at times blowing out of the north directly towards the officers." *Id.* Additionally, he admitted that a marijuana odor may be stronger when it is being smoked and that an odor's strength "depend[s] on the strength of the marijuana." *Id.* at 106. Finally, he conceded that his experiments, on which his opinion rested, did not "involve burning marijuana." *Id.* at 109.

On re-direct, Dr. Doty reviewed weather records and testified that they indicated that the wind was traveling "[w]est-northwest" on the day of the traffic stop. *Id.* at 112. He explained that the weather records "[m]ore or less" indicated that "the wind [was] coming from the west and blowing to the east." *Id.* at 112–13. "[I]n general," he explained, "when you smell something, you want to be downwind from it." *Id.* at 113.

In rebuttal, David. L. Frye testified for the government. Frye is a former Nebraska state trooper, "a part-time deputy with the Seward County Sheriff's Office in Nebraska, and . . . also a director of training for a law enforcement training program called Desert Snow." R. Doc. 62, at 7. "Desert Snow," Frye explained, "is the largest private provider of criminal interdiction training in the United States." *Id.* at 12. As "the director of training," Frye assembles training materials used by the

instructors. *Id.* at 13. Desert Snow conducts "approximately 60 to 70 classes a year" "in over 40 different states," and Frye "teach[es] several of those" classes. *Id.* at 13–14. Frye is "also involved in teaching federal agencies." *Id.* at 14.

Frye described his personal experience as an officer following vehicles and detecting the smell of marijuana. As a patrol officer, Frye testified that he has made "[o]ver 500" "stops . . . over the years." *Id.* at 17. According to Frye, he has "personally interdicted marijuana," among other drugs. *Id.* He testified that, to identify the marijuana odor's source, he would follow cars and observe whether the odor "stay[ed] consistent." *Id.* at 18. If it did, then he would conclude that "the odor was coming from" "the vehicle in front of [him]." *Id.* He would confirm his conclusion by stopping the vehicle. *Id.* Additionally, in his role as director of training for Desert Snow, Frye has "poll[ed] . . . officers across the United States [and learned] that there are hundreds of officers that" "have smelled marijuana when . . . traveling behind a car." *Id.* at 20–21.

Having reviewed the video and other evidence in the case, Frye testified that "[b]ased upon [his] training and experience . . . it [would] have been possible for [the] officers to smell marijuana that was coming from [Shumaker's] vehicle." *Id.* at 22. He "kn[e]w it[] [was] possible because [he had] experienced it on multiple occasions in [his] own life and career." *Id.* His opinion was also based on "the distance [the officers] were traveling behind the vehicle"; "[t]he period of time or the length of time that they traveled behind the vehicle"; and "[t]he conditions or the apparent conditions based upon [his] observation of [the] tape," "includ[ing] the wind." *Id.* at 23–24. Frye testified that a vehicle's windows being up "would diminish the odors leaving the vehicle," although he noted that is "still possible to smell . . . if the windows are up" "but not from a great distance." *Id.* at 24.

Frye further opined that "at some point marijuana was being smoked in the vehicle." *Id.* at 22. He based his opinion on "the dash cam footage show[ing] other

things that [he] commonly encounter[s] with individuals smoking marijuana inside of vehicles." *Id.* at 23. Specifically, the center console contained a cologne bottle and deodorizer. According to Frye, he "[c]onstantly" encounters those items "as an interdiction officer," which are used for "[m]asking and deodorizing." *Id.*

On cross-examination, Frye testified that officers must identify which car is emitting the marijuana odor when driving behind multiple cars prior to making a traffic stop. Additionally, he stated that officers must confirm which car is the source of the odor when they smell marijuana while driving behind a car that is immediately behind another car. According to Frye, strong winds moving against the traffic can carry the marijuana odor a far distance. And, he explained, officers have a harder time smelling a marijuana odor when a vehicle's windows are rolled up. He admitted that marijuana cigarettes are hard to smell if they are in a closed container and that none of the marijuana cigarettes found in Shumaker's ashtray appeared to be burning. But he explained that he would not expect the marijuana cigarettes to be burning because drivers smoking marijuana generally put the cigarette out as quickly as possible prior to the traffic stop.

### 1. *Credibility*

The district court denied Shumaker's suppression motion. First, the court found that "the officers credibly testified that they smelled burnt marijuana while driving behind Shumaker." R. Doc. 49, at 1. The court's conclusion was based "on the officers' demeanor while testifying, the content and consistency of the officers' testimony, Frye's expert testimony, and the video evidence from the stop corroborating the officers' testimony." *Id.* at 13. The court did "not find the absence of smoke, embers, and a lighter sufficiently probative to discredit the officers' otherwise consistent and corroborated testimony." *Id.* at 15. And, the court "credit[ed] the testimony of Frye over the testimony of Dr. Doty on whether the officers could have smelled burnt marijuana while driving behind Shumaker." *Id.* In support, the court cited "an important limitation on [Dr. Doty's] testimony: None of the tests or

experiments he performed on the human capacity to smell marijuana involved burnt marijuana." *Id.* And, the court noted, "Dr. Doty conceded that the smell of burnt marijuana is '[p]resumably' stronger than the smell of unburnt marijuana, and the strength of the smell depends on the strength of the marijuana." *Id.* (quoting R. Doc. 38, at 105, 106). The court found "a stronger basis for [Frye's] testimony" "based on his personal and professional experiences smelling the odor of burnt marijuana while patrolling city streets." *Id.*

The district court also rejected Shumaker's reliance on *State v. Williams*, No. SRCR328401 (Iowa Dist. Ct. Oct. 8, 2019), a case involving a state trial court's suppression of evidence resulting from Officers Minnehan and Steinkamp's traffic stop of a defendant's vehicle "after smelling an odor of marijuana they believed was coming from his car." *Id.* at 16. *Williams* was distinguishable, the district court explained, because "only Officer Minnehan testified, and he could not recall whether he smelled raw or burnt marijuana." *Id.* "[B]y contrast," the court explained, "Officers Steinkamp, Minnehan, and Garrett testified consistently that they smelled burnt marijuana while driving behind Shumaker." *Id.*

## 2. *Particularized Suspicion*

Second, the district court concluded that the officers had a reasonable, particularized suspicion that the marijuana odor was emanating from *Shumaker*'s car, as opposed to other cars in the vicinity. The court based its conclusion on the "calculated steps" "the officers took . . . to confirm that the marijuana odor they smelled came from Shumaker's car." *Id.* at 21. Specifically, all the officers testified that they began "smelling burnt marijuana shortly after turning" and that "they ruled out the black sedan as the source of the odor because they previously followed the black sedan without smelling marijuana." *Id.* Furthermore, the court noted, "[t]he officers drove directly behind Shumaker for thirty seconds and continued to smell marijuana during that time." *Id.* at 21–22.

The court rejected Shumaker's arguments that the officers failed to rule out other vehicles. The court explained that "the officers were not required to separately follow the black truck driving in front of Shumaker to definitively rule it out as the source of the odor" because "Shumaker's car was directly in front of them" and "[t]he black truck was farther away, separated from them by Shumaker's car." *Id.* at 22.

The court also rejected Shumaker's argument that "the officers did not rule out the black sedan because they failed to account for the change in wind after the turn." *Id.* The court found that "the wind evidence [was] inconclusive" and that it actually "undercut[] Shumaker's argument." *Id.* at 23. While Officers Steinkamp and Minnehan testified that "the wind was blowing north to south at the time in question," "the weather records and expert testimony Shumaker introduced contradict[ed]" this evidence. *Id.* Specifically, "Dr. Doty testified based on the records that the wind was blowing west-northwest around the time of the stop," which "[m]ore or less" meant that "the wind [was] coming from the west and blowing to the east." *Id.* Crediting Dr. Doty's testimony, the court noted, would mean that "the wind was blowing against traffic before the officers turned." *Id.* "Based on Dr. Doty's testimony that odors generally travel downwind," the court explained, "the officers would have been more likely to smell marijuana coming from the black sedan *before* turning." *Id.*

Similarly, the court rejected Shumaker's argument that the officers "failed to eliminate other cars on the road," such as the "black SUV driving ahead of Shumaker in the right lane." *Id.* The court pointed out that the black SUV was "not visible on the dash camera video when the officers beg[a]n following Shumaker, and it remain[ed] well ahead of Shumaker until shortly before the officers ma[d]e the stop." *Id.*

II. *Discussion*

Shumaker argues that the district court erred in denying his motion to suppress evidence seized as a result of the traffic stop because (1) the officers' testimony that they smelled marijuana while driving behind him is incredible, and (2) the officers

-12-

lacked a reasonable, particularized suspicion that the marijuana odor was emanating from his vehicle, as opposed to other vehicles in the vicinity.

"On appeal from a denial of a motion to suppress, we review the district court's factual findings for clear error and review its legal conclusions *de novo*." *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020).

"The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. Because a traffic stop is a seizure under the Fourth Amendment, it must be supported by reasonable suspicion or probable cause." *Garcia v. City of New Hope*, 984 F.3d 655, 663 (8th Cir. 2021) (citation and internal quotation marks omitted). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (internal quotation marks omitted).

### 1. *Credibility*

Shumaker contends that the court clearly erred in crediting the officers' testimony that they "could have smelled marijuana based upon less than a gram of unlit marijuana roaches in a covered ash tray." Appellant's Br. at 14–15. Shumaker argues that the officers' claim was implausible and refuted by Dr. Doty's testimony. He further cites the state trial court's rejection in *Williams* of Officer Minnehan's testimony that he and Officer Steinkamp smelled a small amount of marijuana in a vehicle while they were driving their squad car.

Shumaker first contends that the district court clearly erred in concluding that the officers could smell marijuana while trailing Shumaker's car. The district court found "that Officers Steinkamp, Minnehan, and Garrett credibly testified that they smelled burnt marijuana while following Shumaker." R. Doc. 49, at 13. The district court's factual finding was based "on the officers' demeanor while testifying, the

-13-

content and consistency of the officers' testimony, Frye's expert testimony, and the video evidence from the stop corroborating the officers' testimony." *Id.*

"On appeal, we review those findings of fact for clear error, and so long as a factual finding is based upon a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *United States v. Scott*, 818 F.3d 424, 428 (8th Cir. 2016) (internal quotation marks omitted). The question is not "[w]hether we would come to the conclusion in the first instance that [the officers] smelled [marijuana]" while driving behind Shumaker's vehicle. *Id.* at 429. Instead, the question is whether "the district court's factual findings [must] be set aside [in light of] the deference we owe them." *Id.* (citing *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) ("[T]he [district] court's credibility determinations require a high degree of deference.")).

Having reviewed the record, we hold that the district court's factual finding that the officers credibly testified to smelling burnt marijuana while driving behind Shumaker is not clearly erroneous. The district court's credibility finding was based on (1) the consistency of the officers' testimony, (2) the corroborating evidence, and (3) Frye's expert testimony. First, the officers consistently testified to smelling burnt marijuana shortly after turning behind Shumaker's open-windowed Impala. They had not previously noticed the odor when following the close-windowed black sedan. The officers consistently testified that they followed the Impala and that the odor "remained constant," leading to their conclusion that the Impala's occupant was smoking and driving. R. Doc. 38, at 64.

Second, video evidence corroborated the officers' testimony that they smelled marijuana. As the district court explained:

Videos of the stop show the officers making statements both before and during the stop indicating they smelled burnt marijuana coming from Shumaker's car while driving behind him. Shumaker does not respond to these statements with surprise or doubt. Instead, he insists he smoked before driving, and not while driving. At one point, he even explains that the officers could smell his marijuana because it was "strong weed." The officers' testimony is further corroborated by the marijuana roaches recovered from Shumaker's car—one of which was larger and fresher than the others—and the cologne bottle and deodorizer near the ashtray.

R. Doc. 49, at 13–14 (citations omitted).

Third, the district court explained why it "credit[ed] the testimony of Frye over the testimony of Dr. Doty on whether the officers could have smelled burnt marijuana while driving behind Shumaker." *Id.* at 15. Notably, Dr. Doty admitted that "[n]one of the tests or experiments he performed on the human capacity to smell marijuana involved burnt marijuana," while Frye testified "based on his personal and professional experiences smelling the odor of burnt marijuana while patrolling city streets." *Id.* Dr. Doty also conceded that burnt marijuana's smell is "[p]resumably" stronger than unburnt marijuana's smell. *Id.* (alteration in original) (quoting R. Doc. 38, at 105, 106).

The district court also sufficiently explained its rejection of "Shumaker's counterarguments." *Id.* at 14. For example, the district court explained that "the lack of evidence of smoke, embers, and a lighter does not discredit the officers' testimony" that they smelled burnt marijuana because the officers found "several marijuana roaches in Shumaker's car. And Officer Minnehan testified that one of the roaches was larger and fresher than the others." *Id.* at 14–15. The court also credited Officer Minnehan's testimony "that it is not unusual to drive behind a person who is smoking without seeing smoke" "because Shumaker's windows were open." *Id.* at 15. And Frye testified "that marijuana was smoked in Shumaker's car at some point" "based on the

-15-

marijuana recovered, the cologne bottle, and the deodorizer." *Id.* According to Frye, "he would not expect to find embers in the ashtray because individuals who smoke while driving generally extinguish the smoke as soon as possible when they are pulled over." *Id.*

Finally, the district court sufficiently distinguished *Williams* in which a state trial court did not credit Officer Minnehan's testimony that he smelled marijuana emanating from a vehicle. In that case, "only Officer Minnehan testified, and he could not recall whether he smelled raw or burnt marijuana," while in the present case "Officers Steinkamp, Minnehan, and Garrett testified consistently that they smelled burnt marijuana while driving behind Shumaker" and their testimony was "corroborated by their on-video statements, Shumaker's behavior, Frye's expert testimony, and the evidence recovered from Shumaker's car." *Id.* at 16–17.

### 2. *Particularized Suspicion*

Alternatively, Shumaker argues that even if the officers smelled marijuana, they did not have a reasonable, particularized suspicion that his vehicle was the source.

Reasonable suspicion requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). A "hunch" does not suffice, but the standard requires less suspicion than probable cause and "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* at 397 (citation and internal quotation marks omitted). The ultimate determination is based on the totality of the circumstances. *Id.*

Here, Shumaker argues that the officers lacked a particularized suspicion because "several other vehicles were near the patrol car at [the] time, including two vehicles in front of Shumaker"; "[t]he officers only followed [his] vehicle for thirty seconds"; the officers "did not wait to see if the smell continued when Shumaker

-16-

turned onto another road"; and the wind conditions are a "possible explanation" for why the officers did not smell marijuana until they turned and, therefore, the black sedan cannot be ruled out as the source of the marijuana odor. Appellant's Br. at 17–18.

While "[w]e have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception"[3] and declined "to distinguish between a faint smell and a strong smell [of marijuana] in determining whether the marijuana odor is enough to prolong a stop,"[4] we have not directly addressed whether the odor of burnt marijuana justifies an officer's stop of a particular vehicle.

The Third Circuit, however, has addressed how particularized an officer's suspicions must be before stopping a car based on the odor of marijuana. *See United States v. Ramos*, 443 F.3d 304, 306 (3d Cir. 2006). In *Ramos*, officers saw two cars parked next to each other in a parking lot. *Id.* The officers drove their unmarked car between the cars. *Id.* When one of the officers was three or four feet from the defendant's car, "he smelled 'marijuana smoke' through his open window." *Id.* The defendant's window was partially open. *Id.* The officers stopped the defendant after he drove away. *Id.* Upon searching the car, the officers found marijuana and guns. *Id.* The defendant moved to suppress this evidence, and the district court granted the motion. *Id.* at 307.

The Third Circuit reversed, holding that the officers had reasonable suspicion to stop the defendant's car. *Id.* at 309. The court explained:

---

[3]*United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020).

[4]*United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015).

-17-

In the abstract, the defendants may be correct that, at some point, a broadly diffuse and undistinguished marijuana odor will not automatically provide the necessary particularity to establish reasonable suspicion. For instance, had the officers smelled marijuana odor in a crowded bar, they would not be justified to pat down every patron on the claim of some individualized reasonable suspicion. *See Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979). But defendants' claim that reasonable suspicion requires the same level of particularity as probable cause is misguided. *See United States v. French*, 974 F.2d 687, 692 (6th Cir. 1992) (holding that reasonable suspicion existed to stop defendants who had been riding in tandem with a truck that possessed a marijuana odor).

To establish reasonable suspicion, the particularity requirement need not be as stringent as it might be for probable cause. Thus, while probable cause may require the odor to be particularized to a specific person or place, in this case we are satisfied that the totality of the circumstances sufficiently particularized the odor to justify a *Terry* stop of the defendants' car.

*Id.* (footnote omitted).

Based on the totality of the circumstances, the court determined that "it would have been reasonable for the officers to conclude that the odor was coming from one, the other, or both vehicles" and that such "probability establishe[d] the odor as sufficiently particularized." *Id.* As a result, "it was likewise reasonable for the officers[] to suspect that criminal activity was afoot." *Id.*

The present case resembles *Ramos*. "[T]he totality of the circumstances sufficiently particularized the odor to justify a *Terry* stop of [Shumaker's] car" based on the facts identified by the district court. *Id.* Specifically, when the officers first perceived the smell of burnt marijuana, the two cars closest to the officers' vehicle were the black sedan and Shumaker's vehicle. There was no oncoming traffic at that

time; the road was one-way. The officers testified that they eliminated the black sedan as the source of the odor because they previously followed the black sedan without smelling marijuana; furthermore, Officer Garrett testified that the black sedan's windows were up. The officers drove directly behind Shumaker for 30 seconds and continued to smell marijuana during that time. Shumaker's car windows were down, and the scent of burnt marijuana "remained constant" as the officers followed Shumaker's vehicle. R. Doc. 38, at 64.

The district court did not err in denying Shumaker's motion to suppress.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____